735 So.2d 911 (1999)
Susan WOODRUM
v.
OLIVE GARDEN RESTAURANT & Liberty Mutual Insurance Co.
No. 99-CA-130.
Court of Appeal of Louisiana, Fifth Circuit.
May 19, 1999.
*912 Fortune' A. Dugan, Jr., Borrello, Huber & Dubuclet, Metairie, for Defendants-Appellants, Olive Garden Restaurant and Liberty Mutual Insurance Company.
Frank A. Bruno, New Orleans, for Plaintiff-Appellee, Susan Woodrum.
Panel composed of Judges CHARLES GRISBAUM, Jr., EDWARD A. DUFRESNE and SUSAN M. CHEHARDY.
CHEHARDY, Judge.
This is a worker's compensation case in which the employer appeals the determination that plaintiff is entitled to past and future temporary total disability benefits and that the employer is liable for penalties and attorney's fees. The plaintiff has answered the appeal, seeking additional attorney's fees and penalties for preparation and defending of the appeal. We affirm in part and reverse in part.
Susan Woodrum was employed as a food server at the Olive Garden Restaurant in Kenner on July 5, 1996, when she slipped and fell in the kitchen area. Woodrum was unable to go to work the next day and stayed off work through September 3, 1996. She returned to work on light duty, part time, on September 4, 1996 and continued working on that status through October *913 28, 1997, when she discontinued working.
On June 19, 1997 Woodrum filed a disputed claim for compensation against the Olive Garden and its insurer, Liberty Mutual Insurance Company. She alleged that she had suffered soft tissue damage to her entire back, two bulging discs in the lumbar area, one disc in the neck area, and problems with her left arm. She complained that she was not receiving worker's compensation checks in a timely manner, that she was not receiving reimbursement for medication, physical therapy, medical supplies, medical tests, and medical treatment, and that she had been denied permission for mental health treatment.
The restaurant did not contest the occurrence of the accident, nor that it occurred on the job. The restaurant did contest the extent and causation of claimant's injuries.
After a hearing the worker's compensation judge ruled in favor of the plaintiff as follows:
(1) Plaintiff was found entitled to receive temporary total disability benefits from July 5, 1996 through September 3, 1996, supplemental earnings benefits from September 4, 1996 through October 28, 1997, and temporary total disability benefits from October 29, 1997 through the present and continuing.
(2) Plaintiff was found not entitled to reimbursement for unauthorized nonemergency medical treatment that exceeds the cost of $750.
(3) The judge ruled that plaintiff is entitled to one physician of her choice in each area of specialty, listed the chosen physicians, and ordered that their bills be paid by defendants.[1]
(4) The defendants were ordered to pay the bills of two specific doctors who are no longer treating plaintiff, but whose services had been specifically authorized.
(5) The judge found claimant entitled to payment of all medical bills, medication expenses and transportation expenses arising from the accident of July 5, 1996, not specifically delineated in the judgment, including bills for psychological treatment.
(6) The judge held that claimant is entitled to in-patient treatment at a pain clinic and found defendants arbitrary and capricious for their refusal to pay for the pain clinic, assessing a penalty against defendants of $2,000 and awarding plaintiff attorney's fees of $2,000.
(7) Finally, the judge directed that defendants be given credit for all medical expenses, medication expenses and disability benefits that have already been paid.
On appeal defendants contend the worker's compensation judge erred, first, in awarding claimant past and future temporary total disability benefits and, second, in awarding penalties and attorney's fees. Defendants assert that the claim and medical expenses were reasonably controverted based on the medical reports.

FACTS
Plaintiff testified that on the day of the accident, she first thought she had only bruised her hand. Later that evening she began getting headaches and pain in her left leg and hand. She was treated by her chiropractor for lumbar and thoracic strain for six weeks. She stayed off work for three-and-a-half weeks and was paid compensation during that time.
The worker's compensation insurer sent her to see Dr. Nutik, who sent her back to work part-time. She was still in a lot of pain and did not feel ready to return to work, but felt she could not refuse. She continued receiving worker's compensation after she returned to work. At the restaurant she was put to work rolling silverware in napkins for four hours a day. She *914 continued to experience pain, however, stating that the duties assigned her at the restaurant involved body movements that aggravated her discomfort. The job required lifting silverware trays that weighed up to 30 pounds.
When she returned to Dr. Nutik, he said there was nothing wrong and that she could work six hours a day. In addition, he placed her on a work-hardening program and she began having problems with her neck after some of the exercise she was required to do.
Plaintiff then consulted a physician of her own choice because she disagreed with Dr. Nutik's recommendation that she could work six hours a day. She saw Dr. Thomas Whitecloud, who looked at her MRI's and told her she had bulging discs, but that she didn't need surgery. He advised her to continue working, rolling silverware and he sent her to pool therapy, which she continued for a couple of months. Dr. Whitecloud advised her to gradually increase her daily work time from four hours to six hours.
Plaintiff testified she could not get past the four hours, however, and was still working in pain. Dr. Whitecloud told her to get a lumbar corset and prescribed some medication, but told her he did not know what was wrong with her. He referred her to a rheumatologist, Dr. Wooten, who ordered another MRI and diagnosed her with osteoarthritis and hypothyroidism. Dr. Wooten referred her to Dr. Tuuri, who kept giving her new drugs to try because her pain was "real bad." The medication included pain killers and anti-inflammatories.
She began experiencing loss of sensation in her left arm and pain in her shoulder blades. She then went to see Dr. Trahant, a neurologist, who performed an EMG of her left back and arm. He diagnosed her with thoracic outlet syndrome. He recommended that while working, she should roll silverware for only one hour, then do something else. At work she began rolling silverware for one hour, then doing hostess duties for three hours. She continued seeing Dr. Trahant, but after she started getting burning sensations he told her there was nothing more he could do for her. He prescribed some drugs and told her she needed to go to a pain clinic.
She was still under treatment by Dr. Tuuri, who was giving her "different kinds of stuff." Dr. Tuuri then recommended she see Dr. Weisberg, a neurologist, who eventually diagnosed her with fibromyalgia. Dr. Weisberg prescribed medication and referred her to Dr. Brasted, a psychologist, and also recommended she see Dr. Scott, a rheumatologist. She saw Dr. Brasted once. He interviewed her and she took a written test. She did not return to see him, however, because the worker's compensation program would not approve the visits. She said she was taken off work in October 1997 by Dr. Scott, who diagnosed her with fibromyalgia.[2]
She underwent an additional MRI by Dr. Stazio, which showed some lesions on her brain but ruled out the possibility of multiple sclerosis. She was again diagnosed as having fibromyalgia. At the time of trial she was taking medications for sleep and anti-depressants.
She also saw Dr. Derbes at the request of the insurer. Dr. Derbes diagnosed her with myofacial pain syndrome. She had not been advised of any treatment for fibromyalgia other than what she has been doing. She said she would like to go to a pain clinic.
At the time of trial she was seeing a doctor who administered alternative therapies such as acupressure, shiatsu treatments, compression therapy and nutritional therapy. She had also tried hydrogen peroxide therapy and magnetic therapy. *915 She was attending a fibromyalgia support group once a month.
Plaintiff stated she cannot return to rolling silverware because lifting her arms or doing repetitive motion causes burning sensations in her whole body. The burning is worst at the top of her feet, her legs, her back, and the back of her arms. She had begun trying to do more housework, but the left side of her neck was burning "real bad." Dr. Scott told her to stay active and to walk for exercise. However, she had totally stopped exercise walking because of her pain.
She stated she can lie down only on her stomach because any other position burns too much. She cannot lift more than 10 pounds. She can sit up for about an hour, but cannot let her back touch the chair because it causes burning. Driving or wearing a brassiere are painful because of pressure on the back. She can stand in one spot for only a few minutes.
Plaintiff's employment history includes jobs as a waitress, counter help at fast-food restaurants, secretary, store clerk, and assistant manager of a pizza restaurant. At the Olive Garden, her duties as a food server included waiting on tables, filling ice bins, lifting heavy ice buckets, setting up the salad bar, cutting desserts, keeping order in her work area. These tasks required bending, lifting, and carrying trays of food that weighed from 20 to 50 pounds. She worked on her feet seven to eight hours a day, sometimes six to seven days a week.
She testified that before this accident she was very active. She did aerobics, in-line skating, mowed her lawn, and worked in her garden. She admitted to having backaches a couple of years earlier, but said the pain went away after treatment by a chiropractor.
During the course of the trial plaintiff asked for a recess so she could lie down. The judge refused to recess the proceedings, but allowed plaintiff to lie down on her stomach on two chairs placed next to each other.
Plaintiff agreed that her hypothyroidism cannot be attributed to the accident. She said Dr. Wooten told her the osteoarthritis may have been activated by the accident. She also said she saw another chiropractor, Dr. Tassin, because he would do massage therapy, which her original chiropractor did not do. Plaintiff stated she cannot return to work as a secretary because she cannot sit for long enough periods. Similarly, she cannot work at fast-food restaurants because she can only stand for a while and has to lie down constantly. She felt she cannot do any type of work right now.
Plaintiff testified that she has been paid compensation continuously ever since the accident. Since October 1997 she has been paid $671 per month. The parties stipulated that plaintiffs pre-injury wage was $369.84.
Douglas Villavaso, manager of the restaurant, testified the employer would be willing to work with plaintiffs restrictions in tailoring job duties for her. As far as he knew, he had never assigned her to duties that were outside of the restrictions placed on her. He said the restaurant would be advised of such limitations through the insurance company or through doctors' slips plaintiff brought to work.
Karen Juneau, an adjuster for Liberty Mutual, testified to the handling of the claim. She stated there were problems with the various physicians plaintiff saw. Sometimes Juneau was not aware that plaintiff was being treated by a physician until after she had seen the doctor. In addition, plaintiff utilized her right to choose a neurologist, but later sought treatment by a second and a third neurologist. The insurer accepted and paid for the initial chiropractor visits, but then plaintiff wanted another chiropractor.
The insurer refused to pay some doctors due to the "over-choice," including Dr. Tassin. Juneau said the insurer did authorize *916 plaintiff to see Dr. Trahant, although plaintiff testified they had refused to pay Trahant's bills. Juneau also testified, "I have no problem with Dr. Wooten." Juneau stated they had refused to pay Dr. Tuuri's bills because plaintiff told them he was treating her for hypothyroidism. Further, the insurer had seen no medical information to substantiate that he was treating plaintiff for her head and neck.
Liberty Mutual refused to pay Dr. Weisberg because plaintiff had already exercised her right to select a neurologist and was not entitled to a second choice. Similarly, the insurer refused to pay Dr. Scott because plaintiff had already seen Dr. Wooten. Juneau was not aware until the day of trial that plaintiff changed to Scott because Wooten was no longer practicing in Louisiana.
Juneau testified there had been difficulty in obtaining medical records from Dr. Trahant. As a result, there was a delay in paying some of his bills. She did not recall plaintiff being discharged by Dr. Trahant. If he had given up on plaintiff, Juneau said, she would prefer that plaintiff either try to go back to him or find another specialty that would be more in line with her needs.
Juneau also said she would have a problem with a general practitioner treating plaintiff for fibromyalgia; she would have to know whether his treatment would be superior to that of a rheumatologist or other specialist. Juneau admitted she knew that several doctors had recommended plaintiff be treated at a pain clinic. She felt she could not approve that without seeing an evaluation and treatment plan.
As far as Juneau knew, the Olive Garden was still holding a job open for plaintiff as silverware roller, paying $5.25 per hour at 20 hours a week.

MEDICAL EVIDENCE
Testimony of some of the physicians who treated plaintiff was by deposition. The findings of others were submitted through their medical reports and records.
Plaintiff went to a hospital emergency room the day after the accident, where she was diagnosed as having thoracic and lumbar strain, prescribed pain medication, and recommended she get a recheck in two to three days. Later that same day, she went to a chiropractor who had treated her in the past for back pain. X-rays taken both at the hospital and by the chiropractor were negative. Woodrum had nine subsequent visits to the chiropractor.
On July 29, 1996 Woodrum was referred by her employer to Dr. Gordon Nutik, an orthopedic surgeon. Dr. Nutik examined her, took x-rays, and diagnosed her with soft tissue injuries about the neck, midback and lower back, as well as a mild soft-tissue contusion about the left wrist. He treated her conservatively and felt she could return to work on light duty. She saw him more than a dozen times.
On subsequent visits, despite her continuing complaints of pain, Dr. Nutik said he could make no objective findings. He recommended blood tests for rheumatological study and MRIs of the mid- and low-back and EMG of the extremities, active physical therapy, and that she continue working. Although her MRI showed small bulges in two places, he found them minimal and could not relate those changes to the accident because there had been no objective findings on physical examination.
Dr. Nutik noted that myofascial release treatments had appeared to benefit her. He did not think she had fibromyalgia because she did not consistently have all of the complaints associated with this diffuse condition, but, had some rather differential symptoms. He could not say what causes fibromyalgia and deferred to a neurologist. He estimated she has a five percent whole body impairment giving her the maximum benefit of the doubt. He stated he could not prove causation from the MRI findings.
*917 Plaintiff discontinued seeing Dr. Nutik because he said she could work six hours and she knew she couldn't. In addition, she felt the work-hardening program he referred her to worsened her symptoms.
Plaintiff saw Dr. Thomas Whitecloud, an orthopedic surgeon, after she decided to discontinue treatment by Dr. Nutik. Dr. Whitecloud initially saw plaintiff on January 20, 1997 and diagnosed her with mechanical low back pain with bulging discs. He recommended she pursue an aerobic conditioning program and advised she would not injure herself in doing so. He stated she should limit her work to four hours for two weeks, gradually working up to five hours and then six hours over the succeeding weeks. Dr. Whitecloud referred her to a rheumatologist on March 31, 1997 because of the unusual nature of her complaints.
On May 19, 1997 he noted an MRI scan demonstrated two small disc bulges in the cervical area, without associated nerve compression. He was unsure why she was still experiencing pain. On September 8, 1997 he stated she was able to work four hours a day, five days a week. On December 8, 1997 he noted her continuing complaints and recommended she continue follow-up with her neurologist and with the current treatment program.
Plaintiff next saw Dr. Stephen Trahant, a neurologist. He first examined her on April 2, 1997 and diagnosed chronic left trapezius strain and muscle spasm. He suspected thoracic outlet syndrome and carpal tunnel syndrome relative to the mechanics of the injury. On May 21, 1997 he performed an EMG on plaintiff which was normal with regard to her left upper extremity and showed no evidence of cervical motor root impingement. He found she had mild left trapezius tightness and tenderness and recommended use of a TENS unit. After two more visits, on October 15, 1997 Dr. Trahant noted he felt the best approach was referral to a pain clinic to put into effect a multidisciplinary approach. He stated, "I feel that this is the only alternative that would hold any degree of hope for her."
Plaintiff first saw Dr. Marc Wooten, a rheumatologist, on April 21, 1997 by referral from Dr. Whitecloud. Dr. Wooten diagnosed her with chronic low back pain presumably exacerbated by her trauma at work, mild disk disease, mild degenerative joint disease of the knees and shoulders, and hypothyroidism, for which she was prescribed thyroid replacement medication.
Dr. Wooten referred plaintiff to Dr. Stephen Tuuri, an internist, for treatment of her hypothyroidism. Dr. Tuuri first saw her on May 8, 1997. He noted she had cervical disk disease, lumbar strain, hypothyroidism, and depression. He saw her several times over the next several months. On October 28, 1997 he listed his diagnosis as fibromyalgia and signed a work certificate stating plaintiff was unable to return to work due to worsened symptoms.
Plaintiff saw Dr. Leon Weisberg, a neurologist, on Dr. Tuuri's recommendation. Dr. Weisberg stated on August 29, 1997 "the patient has a myofascial pain syndrome which would best be classified as a form of fibromyalgia." He also concluded she had a possible thoracic outlet syndrome or a causalgic type of pain. He recommended comprehensive pain management and that she see a psychiatrist. On December 2, 1997 Dr. Weisberg noted the patient had undergone an MRI scan of the head and he had recommended she seek a second opinion from a multiple sclerosis clinic. He stated that the symptoms "are that of a pain syndrome and best fit with the diagnosis of posttraumatic fibromyalgia." He had explained to her that he did not believe that being sent back to work had caused an exacerbation of her symptoms. He concluded the clinical findings are consistent with fibromyalgia.
On January 5, 1998 Dr. Weisberg said that the symptoms are myofascial pain syndrome of the fibromyalgia type and are *918 directly related to her fall at the Olive Garden. He also did not believe plaintiff could return to work at that time because of the fatigue and the pain syndrome.
Plaintiff saw Dr. John Scott, a rheumatologist, because Dr. Wooten had relocated. Dr. Scott diagnosed plaintiff with fibromyalgia on November 12, 1997. On a subsequent visit on February 4, 1998 he found her MRI consistent with a diagnosis of multiple sclerosis but found it "difficult to sort out her present condition ." On March 4, 1998 he noted she was seeing a physician for alternative treatments which Dr. Scott found "bizarre," including chelation therapy, hydrogen peroxide drips, and intravenous vitamins. He noted that many fibromyalgia patients become dissatisfied with the traditional medical system and start looking at alternative sources of treatment.
Dr. Scott saw plaintiff several times over the next months without change in her condition. On August 12, 1998, Dr. Scott listed her assessment as fibromyalgia and trochanteric bursitis, but noted that "with only eight tender points it would be more difficult to maintain the diagnosis of fibromyalgia." In deposition Dr. Scott remarked he prefers not to encourage fibromyalgia patients to give up working, because they actually seem to do worse after they stop working. He "had no way of knowing" whether she had reached maximum medical recovery, nor could he estimate whether her condition would improve. He stated, "More likely than not, I don't think she's going to get better in the near future." He recommended she be referred to physical therapy for evaluation.
As to whether her fibromyalgia could be attributed to her job accident, he could not say one way or the other. He stated, however, that if she had had a low-grade fibromyalgia and had a bad fall, that could have aggravated it. He felt treatment in a pain clinic would benefit her.
Dr. Antonio Stazio is a neurologist who specializes in study and treatment of multiple sclerosis. He saw her on referral by Dr. Whitecloud. He testified he found her negative for multiple sclerosis. He found all of her symptoms were subjective. He would have thought her symptoms from the accident would have subsided or at least improved in the two years after the accident, but instead they were unchanged or had worsened. He would assume it was more likely that multiple sclerosis would be responsible for the majority of her discomfort. He acknowledged the cause of multiple sclerosis is unknown and some experts believe it can be triggered by trauma, although that is not his belief. He thought plaintiff capable of light-duty work based on the absence of objective signs. However, he said, "if she is in so much discomfort and she is so depressed and in so much pain that she feels she cannot do it ... I have to take her word for it." He deferred to Dr. Scott's opinion as to whether she has fibromyalgia and he recommended that she continue to be treated symptomatically and at the mental health clinic.
The compensation insurer referred plaintiff to Dr. William Brasted, a psychologist, who administered psychiatric testing. On April 6, 1998 he concluded that it is likely the severity of her symptoms will be long-lasting. He recommended she undergo pain management training "not involving excessive physical therapy but rather focusing primarily on the psychological and stress-related issues."
The compensation insurer also referred plaintiff to Dr. Stephen Derbes, a rheumatologist. He testified that plaintiff's symptoms and physical findings are not typical of fibromyalgia. She did not have objective findings of arthritis, so this did not appear to be rheumatoid arthritis or other inflammatory rheumatic diseases. In his opinion she has myofascial pain syndrome, which consists of pain and tenderness in the muscle and tendon areas. He also said that this pain syndrome seemed to arise within 24 or 48 hours after the injury, so it *919 is conceivably related to the initial injury to her back. He stated, however, that trauma-related fibromyalgia is still a controversial area and he would be more inclined to draw an association between her injury and her chronic pain complaints if she had more typical fibromyalgia. He stated clearly, however, that he doesn't know what the plaintiff has.
He described fibromyalgia as, "at best," a syndromea collection of symptoms with vague physical findings and no true objective findings, a "very nebulous condition." Although there are criteria established for diagnosis of fibromyalgia, he said, they are subject to change and probably will change in time.
Derbes characterized the classical fibromyalgia patient as someone who has diffuse pain which is aching in character, disturbed sleep patterns, morning stiffness, fatigue, irritable bowel with intermittent diarrhea and constipation, frequently some urinary discomfort or bladder irritability, and frequent headaches. There will be tenderness in certain characteristic areas such as the base of the skull, the area where the neck muscles attach to the collar bone, the trapezius muscles, the rhomboid muscles, the forearm just below the elbow, sides of the hips, upper buttocks, and inside the knees. These are so-called trigger points which, when pressed on, will cause pain or aggravation of pain.
Dr. Derbes defined myofascial pain syndrome as a generalized broad term used to apply to people who have pain in some area of their body, probably from sprained muscle or tendons. Some of her pain could be related to MRI findings which showed "relatively minor" bulging discs at both the cervical and the lumbar levels. However, he would expect these abnormalities to cause shooting pain in the arms or legs rather than the diffuse burning pain of which she complains. The pain could also be related to the brain abnormalities seen on her MRI.
He noted that plaintiff did not have any demonstrable physical defects. There was no indication of a pinched nerve which would preclude prolonged sitting or use of the arms for light work which did not involve heavy lifting.
He thought her capable of working in a light duty capacity, such as rolling silverware while being able to alternate standing and sitting, avoiding lifting and repetitive bending and stooping. He felt she would benefit from psychological or psychiatric consultation, because she appeared to have an intense emotional overlay which could play a role in the persistence of her symptoms. Or the symptoms could be the result of longstanding chronic pain syndrome.
Dr. Derbes opined that even if plaintiff does have fibromyalgia, she should be able to continue working in a light duty capacity. People with these conditions should be encouraged to work to avoid deconditioning, at least to stay physically active to avoid muscle contracture. He also stated that, based on the history given him, he felt that myofascial pain was caused more likely than not by her accident at the restaurant. He would recommend, further, that she have pain management training as an inpatient, weighted to the psychiatric, psychological and social support. He felt it was too soon to say she is at a point of maximum medical improvement.

APPLICABLE LAW
La. R.S. 23:1221 sets out worker's compensation disability payments as follows, in pertinent part:
Compensation shall be paid under this Chapter in accordance with the following schedule of payments:
(1) Temporary total.
* * * * * *
(c) For purposes of Subparagraph (1)(a) of this Paragraph, whenever the employee is not engaged in any employment or self-employment as described in Subparagraph (1)(b) of this Paragraph, *920 compensation for temporary total disability shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment, including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment. [Emphasis added.]
In a worker's compensation case, as in other cases, the appellate court's review is governed by the manifest error or clearly wrong standard. Bruno v. Harbert International, Inc., 593 So.2d 357, 361 (La.1992). Therefore, a factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978). See also, Smith v. Louisiana Dept. of Corrections, 93-1305 (La.2/28/94) 633 So.2d 129, 132.
The claimant's burden of proof in establishing a causal relation between a job-related accident and the disability is a preponderance of the evidence. Walton v. Normandy Village Homes Ass'n Inc., 475 So.2d 320, 324 (La.1985). A claimant's disability is presumed to have resulted from an accident, however, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that there is sufficient medical evidence to show there to be a reasonable possibility of causal connection between the accident and the disabling condition. Allor v. Belden Corp., 393 So.2d 1233, 1236 (La.1981).
We are unable to say the worker's compensation judge was clearly wrong in finding that plaintiff had established temporary total disability by a preponderance of the evidence. Although the doctors could find no objective reason for her continuing pain and most of them felt she should be able to perform light duty work, they could not say she did not feel the pain she described. The judge as finder of fact was charged with determining the credibility of plaintiff's claims. She viewed the plaintiff at first hand, heard the tone of her voice, and observed her posture and other behaviors. Based on the extensive testimony and mindful of our duty as reviewing court, we are unable to say the worker's compensation judge was clearly wrong in finding plaintiff had presented "clear and convincing evidence" of temporary total disability.
With regard to penalties and attorney's fees, however, we reverse. La. R.S. 23:1201 provides in pertinent part:
F. Failure to provide payment in accordance with this Section shall result in the assessment of a penalty ..., together with reasonable attorney fees for each disputed claim; however, the... penalty shall not exceed a maximum of two thousand dollars in the aggregate for any claim.
* * * * * *
(2) This Subsection shall not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control.
Whether an employer's refusal to pay workers' compensation benefits warrants the imposition of penalties and attorney's fees is a factual question which will not be disturbed on appeal in the absence of manifest error. Kortz v. Colt Energy *921 Services, Inc., 97-159 (La.App. 5 Cir. 7/29/97), 698 So.2d 460, 466.
To determine whether a claim has been reasonably controverted, thereby precluding imposition of penalties and attorney's fees, a court must ascertain whether the employer or insurer engaged in a nonfrivolous legal dispute or possessed factual and/or medical information to reasonably counter the factual and medical information presented by the claimant throughout the time the employer/insurer refused to pay all or part of the benefits allegedly owed. Brown v. Texas-LA Cartage, Inc., 98-1063 (La.12/1/98), 721 So.2d 885, 889.
We find the workers' compensation judge was clearly wrong in assessing penalties and attorney's fees. Defendants had "some valid reason or evidence" upon which to base the denial of inpatient treatment at a pain clinic. The array of symptoms of which plaintiff complained, together with the widely varying opinions of the many doctors who examined and/or treated her, justified defendants' refusal. None of the doctors could find objective reasons for plaintiff's continued complaints of disabling pain. Some appeared to doubt her, others accepted her word. The insurer was not even aware of some of the doctors plaintiff had seen because she failed to obtain advance approval of the visits. Accordingly, the information available to the insurer must be said to reasonably counter the medical and factual information presented by the claimant.
In view of our determination on the issue of penalties and attorney's fees, plaintiffs answer to the appeal requesting additional attorney's fees and penalties for the appeal is moot.

DECREE
For the foregoing reasons, the judgment of the Office of Workers' Compensation is reversed insofar as it awarded penalties and attorney's fees against defendants. In all other respects the judgment is affirmed.
AFFIRMED IN PART AND REVERSED IN PART.
NOTES
[1] Dr. Weisberg, neurologist; Dr. Scott, rheumatologist; Dr. Tuuri, internist; Dr. Fe Borenstein, psychologist; and Dr. Barrett, chiropractor.
[2] According to the medical records, it was Dr. Tuuri rather than Dr. Scott who decided plaintiff was no longer able to work.