STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

09-288 consolidated with 09-672

JUDY DAVIS

VERSUS

STATE OF LOUISIANA, THROUGH THE
DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT,
OFFICE OF RISK MANAGEMENT

**********
APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - #1E
PARISH OF OUACHITA, NO. 04-09196
BRENZA IRVING, WORKERS' COMPENSATION JUDGE

**********

MARC T. AMY
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy and
Shannon J. Gremillion, Judges.

**MOTION TO FILE LATE REPLY BRIEF DENIED. JUDGMENT AFFIRMED.**

**Thibodeaux, Chief Judge, dissents and assigns written reasons.**

George A. Flournoy
Flournoy & Doggett
Post Office Box 1270
Alexandria, LA   71309
(318) 487-9858
COUNSEL FOR  PLAINTIFF/APPELLANT:
        Judy Davis

Leanne M. Broussard
Assistant Attorney General
State of Louisiana
Post Office Box 1710
Alexandria, LA   71309
(318) 487-5944
COUNSEL FOR DEFENDANT/APPELLEE:
         State of Louisiana, through the
         Department of Transportation and Development,
         Office of Risk Management

AMY, Judge.

Although the claimant's employer provided workers' compensation benefits due to a series of work-related accidents, the claimant filed a disputed claim form due to the employer's denial of benefits related to fibromyalgia. After a hearing, the workers' compensation judge found insufficient proof of causation between fibromyalgia and the claimant's work-related accident. It denied benefits related to that diagnosis and denied other requested relief. Subsequently, the claimant filed another disputed claim form which was dismissed upon a granting of the employer's exception of res judicata. The claimant appeals both judgments. For the following reasons, we affirm the denial of further benefits. However, we reverse the granting of the exception of res judicata.

## Factual and Procedural Background

The claimant, Judy Davis, was employed as a laborer for the Department of Transportation and Development when she allegedly sustained injuries to her right hand, wrist, arm and shoulder while shoveling asphalt in May 2000. Subsequently, in September 2000, Ms. Davis fell from a dump truck and allegedly sustained injury to her right side, neck, shoulder, back, and her hip. Finally, the claimant alleges that she slipped while exiting her truck and injured her right shoulder.

Although DOTD provided workers' compensation indemnity and medical benefits, it denied benefits related to fibromyalgia as diagnosed by the claimant's internal medicine and rheumatology physician, Dr. Miguel Garcia. The claimant filed the disputed claim for compensation instituting this matter in December 2004. She designated the following issues for consideration: 1) Extent and duration of disability; 2) Failure to pay indemnity benefits; 3) Failure to pay for medical treatment; 4) Failure to provide vocational rehabilitation; 5) Failure to provide

treatment for fibromyalgia; and 6) Penalties and attorney fees. At the time of the December 2007 hearing, the employer continued to provide indemnity benefits.

During the hearing, the workers' compensation judge excluded various exhibits offered by both the claimant and the defendant due to the parties failure to follow a pre-trial scheduling order. In light of the evidence presented, the workers' compensation judge found that the claimant failed to carry her burden of proving entitlement to benefits related to the fibromyalgia diagnosis. The judgment, signed on April 17, 2008, ordered "that claimant's request for workers' compensation benefits, as related to fibromyalgia, is denied[.]" The workers' compensation judge also denied the claimant's remaining requests.

On the same day as the hearing, December 7, 2007, the claimant filed a new disputed claim for compensation asserting that, among other things, the previous compensation rate was incorrect and again asserting that Dr. Garcia's treatment should be provided. DOTD filed an exception of res judicata arguing that the causes of action alleged in the new claim form arose out of the same transaction or occurrence that was the subject matter of the April 17, 2008 judgment and were, therefore, extinguished. The workers' compensation judge granted the exception and dismissed the claimant's claim.

The claimant appeals both the merits of the April 17, 2008 judgment and the granting of the exception of res judicata.[1] On appeal of the merits, the claimant assigns the following as error in her brief:

---

[1] The appeals of the separate, final judgment were consolidated for dispositional purposes only by order of this court. Both appeals are discussed under Docket Number 09-228, which is an appeal of the merits of the claim and contains the decretal language for the merits of the claimant's suit. The decree relating to the claimant's appeal of the granting of the exception of res judicata is set forth in the companion case, *Judy Davis v. Louisiana Dep't of Transp. & Dev., et al.*, 09-672 (La.App. 3 Cir. _ /_/09), _ So.3d _.

2

I.     Did the WCJ err, as a matter of law, in disregarding the unopposed and uncontradicted opinions of plaintiff's treating physician that she suffered from fibromyalgia as a result of her work-related injuries?

II.     Should the WCJ decision terminating all indemnity and medical benefits be reversed as a result of the WCJ's abuse of discretion in disallowing plaintiff's exhibits and refusing to allow a proffer, thereby necessitating a remand for a determination of (1) plaintiff's AWW, (2) whether plaintiff is totally or partially disabled and (3) the propriety of an award of penalties and attorney fees.

With regard to the granting of the exception of res judicata, the claimant asserts that the ruling was inappropriate as the April 17, 2008 judgment was not yet final. She also asserts that certain aspects of the subsequently filed claim form had not been ruled upon by the workers' compensation judge.

**Discussion**

*Motion to File a Late Reply Brief*

The claimant filed a motion to file a late reply brief, which the employer opposed. The filing was referred to this panel for consideration with the merits. We deny the claimant's motion pursuant to Uniform Rules–Courts of Appeal, Rule 12.7, which provides that "[t]he reply brief, if any, of the appellant shall be filed not later than 10 calendar days after the appellee's brief is filed." In this case, the employer filed its appellee's brief on May 5, 2009. Yet, the claimant's motion to file a late reply brief was not filed until May 26, 2009, after the ten-day period set forth in the rule. Further, the claimant did not set forth reasons for the delay.

*Causation*

In her first assignment, the claimant argues that the workers' compensation judge erred in rejecting what she contends was the uncontradicted evidence of causation offered by her treating physician, Dr. Garcia. She asserts that there was no

sound reason for the workers' compensation judge to disregard Dr. Garcia's opinion that the fibromyalgia diagnosis was related to the work-related accidents.

It is the claimant's burden to establish, by a preponderance of the evidence, a causal link between the work-related accident and the subsequent disabling condition for which benefits are sought. *Guilbeaux v. Office of Dist. Attorney*, 07-89 (La.App. 3 Cir. 5/30/07), 957 So.2d 959. With regard to causation of fibromyalgia, the claimant presented only Dr. Garcia's deposition testimony.[2] The workers' compensation judge's reasons for ruling indicate full consideration of the testimony in his three depositions. The workers' compensation judge explained:

> As to causation, Dr. Garcia found that based on her history and official findings, claimant has fibromyalgia, secondary to the accident of September, 2000.
>
> Dr. Garcia's deposition was taken again on October 29th, 2003. It was taken in an effort to, "clear up" defendant's contention that Dr. Garcia's findings of causation is not supported by the medical community. Dr. Garcia noted he arrived at the diagnosis of fibromyalgia by ruling out other diseases. He noted that fibromyalgia is an entity that is completely clinical. There is not a test that diagnoses fibromyalgia. "What causes fibromyalgia? We don't know. We know things that go to a basic pattern seem to cause the symptomatology. That is why it is a syndrome, not a disease."
>
> Dr. Garcia further found that "anything that will make a person maintain – and maintain that patient without having stage three and four sleeping, sooner or later that person will develop symptoms of fibromyalgia no matter who it is." Dr. Garcia went on to say, "after she had the accident she had problems sleeping, which is the main road to develop fibromyalgia in every patient that has it." He further notes, "one thing is to say that trauma causes fibromyalgia. The other thing is to say that fibromyalgia can be caused by the inability to sleep, caused by the pain that an accident or trauma has caused." Dr. Garcia opined that the only thing that we know that causes fibromyalgia is sleep pattern disturbance. He found that the fibromyalgia is secondary to the pain and the inability to sleep that claimant reported after the injury as a result of the accident.

---

[2] As will be discussed below, the workers' compensation judge excluded certain exhibits by both the claimant and the defendant for failure to follow a pre-trial scheduling order.

Counsel for defendant noted literature indicating fibromyalgia did not exist. It was a fallacy. Dr. Garcia acknowledged literature indicating there is no such thing as traumatic fibromyalgia. He notes his agreement with that literature. In an effort to explain that agreement versus his findings of causation in reference to claimant, he notes "It is not the trauma that causes the fibromyalgia. What causes fibromyalgia is injuries to a patient that prevents them from sleeping."

Lyme Disease and Hypersensitivity Syndrome to pain were discussed as alternative diagnoses for claimant's symptoms. However, testing for those problems were not performed. There are no laboratory tests available for diagnosing fibromyalgia. Doctors must rely on patient's histories and self-reported symptoms.

Dr. Garcia admitted fibromylgia symptoms overlap with other symptoms and conditions and diseases of the body. He also acknowledged that fibromyalgia is a chronic, painful musculoskeletal disorder of unknown etiology and/or physiology. There is no consensus on fibromyalgia in terms of causation. There is no professional scientific consensus.

Dr. Garcia's deposition was taken for a third time on November 29th, 2007. Once again he acknowledged that fibromyalgia is a syndrome that can be caused by different factors. The most frequent factor is disturbance in the sleep process. He felt claimant's accident caused her to be depressed, which led to a sleep disturbance. He also noted that claimant is five feet and three inches tall and weighs 197 pounds. Those factors place her at risk of having sleep apnea which will exacerbate fibromyalgia.

Dr. Garcia was shown a report generated by defendant's choice of physician, Dr. Merlin Wilson.[3] Dr. Wilson found claimant had tender points that were suppose to be negative which were control points. In Dr. Wilson's opinion, claimant had "something else."

. . . .

Claimant has been diagnosed with fibromyalgia. According to her own treating physician, fibromyalgia is a syndrome, not a disease. It is a diagnosis of exclusion. According to Dr. Garcia, a syndrome is, "you don't know what causes it. It can be multiple things." He arrived at the diagnosis by ruling out other things, but he admits claimant was never tested for diseases including Lyme Disease and Hypersensitivity Syndrome to Pain. According to Dr. Garcia's testimony, fibromyalgia is related to sleep disturbance and may be caused by pre and post

---

[3] Although Dr. Wilson's report was excluded at the hearing, the workers' compensation judge's references are to the discussion regarding Dr. Wilson's findings during Dr. Garcia's deposition.

menopause. Dr. Garcia noted fibromyalgia is a chronic, painful musculoskeletal disorder of unknown etiology.

The findings of an unknown etiology prevents claimant from meeting her burden of proof in this case. The medical evidence falls short of a finding that claimant's injuries of May 16th, 2000 and September 14th, 2000, caused her to have fibromyalgia, a syndrome which is questionable even in its form, nature and existence. Any finding that claimant has fibromyalgia and that the fibromyalgia is related to her work accident would be based on speculation and conjecture. Jurisprudence has held where evidence leaves the probabilities evenly balanced or shows only a possibility of a causative accident or leaves it to speculation or conjecture, then the claimant's case must fail.

Furthermore, defendant's choice of physician, Dr. Merlin Wilson, disagreed with Dr. Garcia's diagnosis as noted in the deposition of Dr. Garcia.

For these reasons, claimant's request for workers' compensation benefits, as related to fibromyalgia, is denied. Medical evidence demonstrating a causally related disability due to claimant's work accident was not presented to this Court, and her requests are denied.

In *Winford v. Conerly Corp.*, 04-1278, pp. 15-16 (La. 3/11/05), 897 So.2d 560, 569-70, the supreme court set forth the standard of review as follows:

It is well settled that factual findings in workers' compensation cases are subject to the manifest error or clearly wrong standard of appellate review. *Banks v. Industrial Roofing & Sheet Metal Works, Inc.*, 96-2840 (La.7/1/97) 696 So.2d 551, 556. (citations omitted). In applying the manifest error-clearly wrong standard, the appellate court must determine whether the factfinder's conclusion was reasonable, not whether the trier of fact was right or wrong. *Banks*, 696 So.2d at 556 (citing *Stobart v. State*, 617 So.2d 880, 882 (La.1993)). Where there are two permissible views of the evidence, a factfinder's choice between them can never be manifestly erroneous or clearly wrong. *Id.* (citations omitted). Thus, even where the appellate court is convinced it would have weighed the evidence differently if it had been sitting as trier, the court of appeal may not reverse if the factfinder's findings are reasonable in light of the record reviewed in its entirety. *Id.*

Under this review, we find no manifest error in the workers' compensation judge's denial of benefits related to fibromyalgia. The workers' compensation judge considered Dr. Garcia's testimony at length, reproducing much of his testimony in the nine-pages of written reasons. Although Dr. Garcia opined that the claimant's

6

condition is secondary to her work-related accident, he also explained that the condition is a syndrome rather than a disease, is a diagnosis of exclusion, and can be caused by various factors. We find no manifest error in the workers' compensation judge's determination that this type of explanation was insufficient to meet the claimant's burden of proving causation. This is true even in light of Dr. Garcia's further statement that the fibromyalgia diagnosis was secondary to the work-related accident. It is clear that a trier of fact is charged with the evaluation of expert testimony and that the trier of fact may accept or reject an expert's opinion in whole or in part. *Ryan v. Zurich American Ins. Co.*, 07-2312 (La. 7/1/08), 988 So.2d 214. Dr. Garcia's testimony as a whole regarding the circumstances surrounding a diagnosis of fibromyalgia provide a sufficient basis for the workers' compensation judge's rejection of Dr. Garcia's ultimate conclusion that the claimant's condition was secondary to her work-related accident.

Finally, the claimant points out that fibromyalgia has been found to be a compensable workers' compensation claim. However, each of the cases cited by the claimant[4] are ones in which the workers' compensation judge initially found that the claimant demonstrated causation under the facts of that case. That determination was affirmed on appeal under the applicable deferential standard of review. This case is distinguishable as the workers' compensation judge determined that the plaintiff failed to meet her burden of proof. The workers' compensation judge considered, evaluated, and weighed the evidence before finding Dr. Garcia's testimony as to

---

[4] The claimant cites to the following: *Frith v. Riverwood, Inc.*, 03-1672 (La.App. 5/14/04), 879 So.2d 763; *Lizana v. Gulf Coast Pain Inst.*, 03-1672 (La.App. 1 Cir. 5/14/04), 879 So.2d 763; *Woodrum v. Olive Garden Rest.*, 99-130 (La.App. 5 Cir. 5/19/99), 735 So.2d 911; *Theus v. Schumpert Med. Ctr.*, 25,750 (La.App. 2 Cir. 4/5/95), 653 So.2d 178; *Herren v. State*, 25,564 (La.App. 2 Cir. 2/23/94), 632 So.2d 880.

causation insufficient to meet the claimant's burden of proof. We do not find this determination manifestly erroneous under the deferential standard of review.

This assignment lacks merit.

*Termination of Benefits*

Next, the claimant addresses the workers' compensation judge's exclusion of certain exhibits for violation of the pretrial scheduling order as well as testimony regarding the inclusion of fringe benefits in the calculation of the claimant's average weekly wage. The claimant contends these rulings were in error and asserts that the lack of evidence prevented her from demonstrating entitlement to continued benefits, notwithstanding the benefits claimed for fibromyalgia.

The workers' compensation judge excluded the evidence at issue for three reasons. First, the workers' compensation judge excluded evidence regarding fringe benefits as the issue was not listed on the claimant's disputed claim form. Second, the workers' compensation judge excluded payroll documents as the claimant's subpoena for the evidence was untimely served. Third, exhibits of both the claimant and the employer were excluded as neither properly produced a pretrial statement as required by the pretrial scheduling order.

With regard to the issue of fringe benefits, the workers' compensation judge observed that the issue was not raised in the claimant's 1008 form, which lists the following issues to be determined:

a. Extent and duration of disability
b. Failure to pay indemnity benefits
c. Failure to pay for medical treatment
d. Failure to provide vocational rehabilitation
e. Failure to provide treatment for fibromyalgia
f. Penalties and attorney fees

No mention is made of the calculation of the claimant's average weekly wage. Further, the Scheduling Conference Order of February 2, 2006 lists these same issues

8

and directed the parties "to submit a pre-trial statement within 7 days. Failure to do so may result in exclusion of evidence and/or testimony." In excluding the evidence as to fringe benefits, the workers' compensation judge observed that neither the 1008 listed the fringe benefit issue and noted the claimant's failure to file a pretrial statement. The judge also referenced 40 La.Admin. Code tit. I, § 6007, which relates to the pretrial statement and provides:

> A. The pretrial statement shall include:
> 1. Stipulations agreed to by all parties;
> 2. *issues to be litigated;*
> 3. contentions;
> 4. a list and brief description of all exhibits to be offered at trial;
> 5. a list of all witnesses to be called at trial;
> 6. desirability of mediation.
> B. *Amendments to the pretrial statement shall only be by written motion and permitted only for good cause shown.*

(Emphasis added.)

Although La.R.S. 23:1317 provides that "[t]he workers' compensation judge shall not be bound by technical rules of evidence or procedure other than as herein provided," we find no abuse of the workers' compensation judge's discretion in its enforcement of the rules of its office. We conclude that the limited contents of both the 1008 and the pre-trial scheduling order, as well as the claimant' failure to file a pretrial statement, support the exclusion of evidence regarding fringe benefits.

Similarly, the workers' compensation judge enforced its scheduling order in excluding the exhibits of both parties due to their failure to file a pretrial statement. The exclusion of the claimant's evidence effectively prevented the claimant from presenting her case regarding her entitlement to disability benefits for conditions other than fibromyalgia and prevented the employer from rebutting evidence regarding the causation of fibromyalgia. The workers' compensation judge did, however, tailor its ruling and permitted the claimant to present evidence on which the

9

employer lodged no objection. This evidence included Dr. Garcia's depositions. As above, we find no abuse of discretion in the workers' compensation court's enforcement of its rule.

Finally, the claimant disputes the exclusion of payroll records produced by the employer and the workers' compensation judge's refusal to allow the proffer of the records. The exclusion of these records was based on the claimant's failure to abide by the office's rule that "[i]n order to be enforceable, subpoenas for hearing shall be served seven (7) days prior to the scheduled hearing date[.]" 40 La.Admin. Code tit. I, § 5909. Instead, the claimant filed the subpoena involving the payroll records only two days prior to hearing. Given the clear language of the order, we find no abuse of discretion in the workers' compensation judge's exclusion of the records and, since they were improperly produced, its refusal to allow a proffer of the records. Additionally, the workers' compensation judge permitted the claimant's attorney to provide a statement setting forth the nature of the evidence pursuant to La.Code Civ.P. art. 1636(A)(which provides that "[w]hen the court rules against the admissibility of any evidence, it shall either permit the party offering such evidence to make a complete record thereof, or permit the party to make a statement setting forth the nature of the evidence").

This assignment lacks merit.

*Exception of Res Judicata*

As explained above, the claimant filed an additional disputed claim form on the day of the December 7, 2007 hearing on the merits of this case. The employer filed an exception of res judicata on the basis that the issues contained therein were adjudicated at the initial hearing. The workers' compensation judge granted the exception, ordering "that the 1008 form, docket number 07-09286, filed on December

10

7, 2007, is dismissed with prejudice[.]" The claimant disputes the dismissal of the claim form on appeal.

While La.R.S. 13:4231 generally addresses res judicata, workers' compensation cases have an even more specific reference in La.R.S. 23:1310.8(E) which provides that "[a] judgment denying benefits is res judicata after the claimant has exhausted his rights of appeal[.]" Accordingly, as the initial judgment denied benefits and appellate rights had not yet been exhausted, the exception of res judicata was improperly granted. We reverse the granting of the exception of res judicata.

## DECREE

For the foregoing reasons, the workers' compensation judge's judgment of April 17, 2008 is affirmed. All costs of this proceeding are assessed to the appellant, Judy D. Davis.

**MOTION TO FILE LATE REPLY BRIEF DENIED. JUDGMENT AFFIRMED.**

11

JUDY DAVIS

VERSUS

STATE, THRU DOTD, OFFICE OF RISK MANAGEMENT


**THIBODEAUX, Chief Judge, dissenting.**


I dissent. While an appellate court must be deferential to the reasonable findings of a trier of fact, it is not compelled to slavishly adhere to those findings when the record, read as a whole, dictates otherwise. *See Ambrose v. New Orleans Police Dep't Ambulance Serv.*, 93-3099 (La. 7/5/94), 639 So.2d 216. This is such a case. A careful reading of the entire record cries out for a reversal of this judgment.

### Exclusion of Exhibits

The workers' compensation judge (WCJ) erred in several procedural rulings that resulted in the exclusion of almost all of the parties' evidence at trial.

At trial, Ms. Davis' attorney examined Kayla Crowe regarding the inclusion of fringe benefits in the DOTD's calculation of AWW. Ms. Crowe's answer was uncertain, and the WCJ specifically instructed her to review the file and to be ready to answer the question regarding fringe benefits at the end of trial. Subsequently, when Ms. Davis' attorney began examining Kenneth Morris, the DOTD's business manager, regarding the inclusion of fringe benefits in the calculation of Ms. Davis' wage benefits, the DOTD objected on the basis that the subpoena of those records had not been served timely. The WCJ then excluded

evidence of fringe benefits on the basis that "fringe benefits" was not a specifically listed dispute on the 1008 claim form, rejecting Ms. Davis' arguments that a correct calculation of average weekly wage (AWW) necessarily included consideration of fringe benefits such as paid leave and medical insurance contributions by the employer. Ms. Davis was correct. *See Johnson v. Louisiana Container Co.*, 02-382 (La.App. 3 Cir. 10/2/02), 834 So.2d 1052, *writ denied,* 02-3099 (La. 5/9/03), 843 So.2d 394 (whether the employer provided the claimant fringe benefits is relevant to the issue of the proper calculation of his wage rate).

In the present case, the WCJ made this ruling after allowing earlier testimony on the issue and instructing adjuster Kayla Crowe to report at the end of trial whether fringe benefits were included in her calculation of AWW. Wage benefits were a major issue at the trial, and it was unreasonable and inconsistent to remove the issue based upon the absence of the specific words, "fringe benefits," on Ms. Davis' 1008, particularly when the DOTD did not object to the earlier examination of their adjuster, Kayla Crowe, on the issue, and where the WCJ had on several prior occasions stated that AWW was an issue to be determined at trial.

After the WCJ removed the issue of fringe benefits from the trial, and sustained the DOTD's objection to the untimely subpoena of the payroll records, the WCJ agreed to a proffer and left the courtroom in order for Ms. Davis' attorney to receive the records and testimony of Mr. Morris. However, the DOTD stopped Mr. Morris from handing over the payroll records. The WCJ then returned to the courtroom, agreed with the DOTD, and disallowed the proffer of the actual records.

The exclusion of the payroll records was based upon Louisiana Administrative Code (LAC) 40:I:5909, which provides in pertinent part:

> B. In order to be enforceable, subpoenas for hearing shall
> be served seven days prior to the scheduled hearing date;

2

subpoenas to compel attendance of medical experts shall be served 10 days prior to hearing. Subpoenas for hearing may be issued after expiration of these time limits only by leave of court for good cause shown or upon written consent of all parties.

In the present case, the subpoena of the payroll records for 2000 and 2001 was issued two days before trial. However, Mr. Morris was present at the trial and *had the records* with him. Moreover, Ms. Davis' attorney had been trying to get the records since at least February 2002, having requested payroll records and evidence of *fringe benefits, specifically*, in discovery requests and correspondence. The DOTD's 2002 responses to discovery indicated that they attached partial records and would forward the remainder when they were received. The DOTD was not surprised or prejudiced by this request where they had known for at least five years that fringe benefits would be an issue in determining AWW and had allowed Mr. Morris to appear and bring the payroll records with him.

Moreover, it is well-settled that in workers' compensation proceedings technical rules of evidence and procedure are materially relaxed. While the majority recognizes this concept, it refuses to apply it. Our jurisprudence has repeatedly held that the courts are not bound by technical rules of evidence or procedure in workers' compensation suits. *See Leson Chevrolet, Inc. v. Triche*, 98-1328 (La.App. 5 Cir. 9/28/99), 742 So.2d 1047; *Lummus v. Shoney's*, 99-90 (La.App. 5 Cir. 6/1/99), 738 So.2d 117; *Louisiana Clinic v. Patin's Tire Service*, 98-1973 (La.App. 3 Cir. 5/5/99), 731 So.2d 525. In fact, this concept is statutory in Louisiana, pursuant to La.R.S. 23:1317, which provides in pertinent part as follows:

**[R.S. 23:]1317. Hearing on the merits; rules of procedure; effect of judgment; costs; fees of medical witnesses**

A. If an answer has been filed within the delays allowed by law or granted by the workers' compensation

3

judge, or if no judgment has been entered as provided in R.S. 23:1316 at the time for hearing or any adjournment thereof, the workers' compensation judge *shall hear the evidence that may be presented by each party*. Each party shall have the right to be present at any hearing or to appear through an attorney. *The workers' compensation judge shall not be bound by technical rules of evidence or procedure other than as herein provided, but all findings of fact must be based upon competent evidence* and all compensation payments provided for in this Chapter shall mean and be defined to be for only such injuries as are proven by competent evidence, or for which there are or have been objective conditions or symptoms proven, not within the physical or mental control of the injured employee himself. *The workers' compensation judge shall decide the merits of the controversy as equitably, summarily, and simply as may be.*

(Emphasis added.)

The WCJ refused to allow the attorney for Ms. Davis to proffer the payroll records that were there and *available* in the courtroom. Louisiana Code of Civil Procedure Article 1636(A) provides: "When the court rules against the admissibility of any evidence, it shall either permit the party offering such evidence to make a complete record thereof, or permit the party to make a statement setting forth the nature of the evidence." The opportunity to proffer the excluded evidence is mandatory, "but the trial court has the discretion to receive the proffer in full, or to require a statement setting forth the nature of the evidence." *Mitchell v. Limoges*, 05-832 (La.App. 3 Cir. 3/1/06), 923 So.2d 906, 909, *writ denied,* 06-0723 (La. 6/16/06), 929 So.2d 1285. In this case, the WCJ did allow a statement setting forth the nature of the evidence, indicating a fulfillment of La.Code Civ.P. art. 1636(A). However, under the facts of this case, where the witness was testifying with the *documents in his possession*, the WCJ violated the letter and the spirit of La.R.S. 23:1317 by excluding evidence that would have helped resolve the issues summarily and simply.

In another procedural ruling, the WCJ, on her own initiative, interrupted the examination of Ms. Davis' husband, stating that Mr. Davis could not testify because Ms. Davis had not filed a pre-trial statement listing him as a witness. The WCJ then allowed a proffer of this testimony. When Ms. Davis' attorney attempted to enter his twenty-five exhibits into the record, the DOTD objected, stating that it had just gotten Ms. Davis' exhibit list that morning. Except for the three depositions of Dr. Garcia, Ms. Davis' exhibits, including her medical records, were excluded from trial for failure to list them in a pre-trial statement. This included the deposition of Dr. Quillin, which was taken by the DOTD. Each exhibit was described individually and proffered by Ms. Davis' attorney, who then had no choice but to rest his case. When the DOTD attempted to call their adjuster, Kayla Crowe, as their witness, Ms. Davis' attorney objected on the grounds that the defendant had not timely filed its pre-trial statement. The record indicates that the defendant's pre-trial statement was faxed the day before trial but was file stamped on the morning of trial. Accordingly, the DOTD's witness testimony was excluded, then proffered, and the trial was concluded.

The exclusion of evidence for failure to file a pre-trial statement, or an untimely filing of a pre-trial statement was based upon the Louisiana Administrative Code's hearing rules at LAC 40:I:6005 and 6007.[1]  Again, our courts have often

---

[1]§6005. Pretrial Conference: A. When requested by the court, each party to the dispute shall file a pretrial statement with the appropriate district office within the time frame designated by the court. . . .

§6007. Pretrial Order: A. The pretrial statement shall include: 1. stipulations agreed to by all parties; 2. issues to be litigated; 3. contentions; 4. a list and brief description of all exhibits to be offered at trial; Exhibits to be used for impeachment or rebuttal need not be included in the list...; 5. a list of all witnesses to be called at trial.... Except for the witnesses listed, no other witnesses may be called to testify except for good cause shown. This requirement shall not apply to impeachment and rebuttal witnesses; 6. outstanding discovery and depositions to be taken. . . .

found that the requirement to file a pre-trial statement is a technical requirement that the courts are not bound to apply.

In *Douglas v. Grey Wolf Drilling Co.*, 03-515 (La.App. 3 Cir. 11/5/03), 858 So.2d 830, the claimant failed to file a pre-trial statement. He then offered his testimony and that of his wife, as well as several exhibits. The WCJ allowed the evidence, given that the employer had taken the claimant's deposition and that his documentary evidence was either generated by or otherwise available to the employer. Similarly, in the present case, the excluded deposition of Dr. Quillin was taken by the DOTD, and it clearly had this evidence in its possession, as well as Ms. Davis' medical records, employer reports, and payroll information which constituted the exhibits sought to be introduced by Ms. Davis. *See also Parrish v. Van-Tel Communications*, 07-454 (La.App. 3 Cir. 10/10/07), 967 So.2d 592.

In *Meche v. Foremost Management Corp.*, 93-1390, p. 5 (La.App. 3 Cir. 5/4/94), 640 So.2d 585, 587, *writ denied*, 96-152 (La. 3/15/96), 669 So.2d 429, we quoted *Keyes v. Rockwood Ins. Co.*, 502 So.2d 223, 228 (La.App. 3 Cir. 1987), stating that La.R.S. 23:1317 reflected the legislature's intent in compensation cases to "materially relax evidentiary and procedural rules and subordinate procedural considerations to the discovery of the truth and the protection of substantive rights." As the second circuit explained in *Vernon v. Wade Correctional Institute*, 26,053, p. 5 (La.App. 2 Cir. 8/19/94), 642 So.2d 684, 688, "[t]he theory inherent in pretrial procedure is the avoidance of surprise and the allowance of the orderly disposition of the case."

In the present case, where the excluded evidence caused no prejudice and no surprise, the WCJ's procedural rulings had the opposite effect. They prevented the resolution of the issues by prohibiting both parties from presenting witnesses and

6

exhibits necessary to discover the truth regarding benefits. Accordingly, the WCJ again committed legal error by violating the letter and spirit of La.R.S. 23:1317 and by inflexibly binding the parties to procedural rules, excluding competent evidence available at trial, and preventing the resolution of the issues; i.e., the nature and extent of disability, whether temporary or permanent, whether partial or total, and the amount of indemnity/wage benefits due the claimant. Therefore, I would consider all proffered evidence by both parties in an attempt to resolve the issues susceptible of resolution, given the record before us.

## Fibromyalgia

The judgment of the WCJ stated that Dr. Garcia noted that fibromyalgia was a chronic, painful musculoskeletal disorder of unknown etiology, and that such findings prevented Ms. Davis from meeting her burden of proof in this case. The majority agrees. The WCJ further stated that the medical evidence fell short of proving that Ms. Davis' injuries of May and September 2000 caused her to have fibromyalgia. The majority again agrees. The record reveals otherwise. The record shows that Dr. Garcia was deposed three times, and *each* time he testified that Ms. Davis' fibromyalgia was a *result* of her work injuries in 2000. The record further reveals that Dr. Garcia's opinion on the relatedness of fibromyalgia is supported by Louisiana jurisprudence, and was supported in this case by Dr. David Levinsohn, Ms. Davis' first orthopedist; Dr. Michael Dole, Ms. Davis' pain management specialist; Dr. James Quillin, Ms. Davis' psychologist; and, Dr. Baer Rambach, a second orthopedist who treated Ms. Davis.

Dr. Levinsohn saw Ms. Davis in June 2000 after the May 2000 accident. His impression was right wrist extensor tendinitis. In early November, he opined that all of her problems were related to her work injuries: neck pain, right mild rotator

7

cuff tendinitis, possible right cervical radiculopathy, right lateral epicondylitis, low back pain, deQuervain's tenosynovitis, and extensor tendinitis of the right wrist, exacerbated by depression. Dr. Levinsohn suspected fibromyalgia in December 2000 and a month later reported that there was "[c]ertainly evidence of fibromyalgia." In March 2001, his impression was fibromyalgia. Dr. Levinsohn's impression of fibromyalgia did not change, and it existed *before* Ms. Davis slipped again, while on "light duty" on the truck, pulling and re-injuring her shoulder in June 2001. Dr. Levinsohn referred Ms. Davis to Dr. Miguel Garcia.

Dr. Miguel Garcia is board-certified in internal medicine and rheumatology, diseases that involve muscles, bones, joints, and pain-causing illnesses. He was accepted at trial as an expert in internal medicine, rheumatology, and fibromyalgia. Having been referred to Ms. Davis by Dr. Levinsohn and Dr. Coney, Dr. Garcia began seeing Ms. Davis in March 2001. His treatment for fibromyalgia consists of medication, injections into soft tissue, tendons, or joints, and infusions into the veins. He testified that there was no surgical remedy for fibromyalgia.

Dr. Garcia explained that patients who have fibromyalgia generally feel as if they have the flu 365 days a year. They are tired, achy, sore, stiff, fatigued; they exhibit mood changes, depression, and tenderness to palpitation over muscular areas. Dr. Garcia indicated that the diagnosis of fibromyalgia currently describes eighteen tender points with control points to rule out malingering. Dr. Garcia testified that the first time he examined Ms. Davis, she exhibited eighteen of the eighteen tender points and was negative for all of the control points. He stated categorically that there was no doubt in his mind that she had fibromyalgia and that there was no differential diagnosis.

8

Dr. Garcia further testified that fibromyalgia patients are not normal in three aspects: (1) an electroencephalogram will indicate changes in brain waves; (2) there are changes in sleep patterns with markedly decreased sleep in stages three and four where muscle rest takes place; (3) there are decreased levels of growth hormone and active compounds that help muscles to regenerate. He further stated that fibromyalgia patients have increased levels of Substance P, which primes the central nervous system to feel pain. Dr. Garcia admitted that the diagnosis is one of exclusion (ruling out other diseases), but stated that the common denominator for distinguishing fibromyalgia from other problems with similar symptoms is the inability to sleep. He stated that some symptoms are subjective, such as fatigue and achiness, but depression is diagnosed by the physician, and tenderness to palpitation is tested using control points. Dr. Garcia diagnosed Ms. Davis as having fibromyalgia and restless leg syndrome, which she developed shortly after the third DOTD accident in June 2001.

The WCJ stated that at the time of Dr. Garcia's examination, "no physical injuries were identified or diagnosed from claimant's fall" and that the medical evidence fell "short of a finding that claimant's injuries of May 16, 2000 and September 14, 2000 caused her to have fibromyalgia . . . ." However, this is *not* supported in the record. Dr. Garcia testified that Ms. Davis did not have a *fracture*, but after the accidents, she started with pain that did not stop, causing her to wake up every thirty minutes. He stated that her history indicated that she fell from a dump truck five feet straight down to her right side, hitting her shoulders, neck and low back, and that there was no pain or symptoms before the accident. The WCJ also stated that Dr. Garcia's testimony that fibromyalgia was of an "unknown etiology" prevented Ms. Davis from carrying her burden of proof. The testimony of Dr. Garcia,

9

while stating that fibromyalgia was not a disease but a syndrome, thereby providing little in the way of causation except for the history of the patient, clearly presented evidence that the fall at work *caused* the pain that *caused* Ms. Davis' sleep deprivation, which was the cornerstone symptom of fibromyalgia.

With regard to the relatedness of Ms. Davis' condition to her work injuries, Dr. Garcia repeatedly testified that she developed fibromyalgia after the September 2000 accident and therefore had classic fibromyalgia secondary to the September 2000 accident.

The WCJ in her reasons for judgment intimated that other symptoms of fibromyalgia could have been caused by weight gain or menopause. However, Dr. Garcia testified that Ms. Davis was post-menopausal, that the symptoms were not of the same degree, and that since she had already been on a regimen of hormones, symptoms of menopause would not be expected. He further testified that two of her medications, Miropex and Zanoflex, could cause weight gain, and those were therefore switched out for others. The DOTD did not object to the admission of Dr. Garcia's three depositions, and his testimony clearly related Ms. Davis' work injuries to her pain, depression, sleep loss, and fibromyalgia. Dr. Garcia was still treating Ms. Davis at the time of trial. About mid-way through his treatment, Dr. Garcia referred Ms. Davis to Dr. James Quillin, a psychologist, for her ongoing depression.

Dr. Baer Rambach, an orthopaedic surgeon with Mid-South Orthopaedics, saw Ms. Davis in November 2001. His impression was fibromyalgia secondary to the September 2000 accident. He ordered an MRI in December 2001 wherein the radiologist reported *no significant* disc bulge or herniation. In February 2002, Dr. Rambach's records indicate that Ms. Davis' symptoms upon examination

were consistent with fibromyalgia, and that she could not return to her former occupation.

In May 2003, Dr. Merlin Wilson, a rheumatologist, examined Ms. Davis on behalf of the DOTD. Dr. Wilson's impressions were soft tissue injuries to wrist, neck, and back, while working in a highway crew in 2000. He also diagnosed osteoarthritis. Dr. Wilson reported that Ms. Davis may have fulfilled the criteria for fibromyalgia on previous visits to Dr. Garcia but did not fit the criteria according to his examination. Dr. Wilson stated that, upon his examination, Ms. Davis was positive for all eighteen tender points found in fibromyalgia patients (eleven of eighteen is sufficient for the diagnosis). However, Dr. Wilson also stated that Ms. Davis was positive for eight of the ten control points that should have been negative. Dr. Wilson did not offer narrative detail on the control points that led him to discount a diagnosis of fibromyalgia. Nor do Ms. Davis' medical records appear to provide the locations of the eighteen tender points or the locations of the ten control points. Therefore, while Ms. Davis commented during one visit with Dr. Garcia that Dr. Wilson only touched her neck in four places, we cannot know whether that was sufficient or insufficient. However, we do know that Dr. Wilson saw Ms. Davis one time only and for *non-treatment* purposes.

Dr. James Quillin, the psychologist referred to Ms. Davis by Dr. Garcia, for Ms. Davis' ongoing depression, first saw her in October 2003. During his treatment, Dr. Quillin's impression was that she had chronic pain syndrome related to her occupational injuries. Fibromyalgia is a chronic pain syndrome. Dr. Quillin testified in his deposition that Mrs. Davis was never pain free from her first accident, that she had severe depression due to the chronic pain; she could not sleep, had crying spells and low energy. He further reported that she was improving at one point until

11

her medication was stopped, due to non-approval by the adjuster, and that without medications, her condition deteriorated.

In June of 2006, Dr. Quillin reported that Ms. Davis was in more pain and was more tearful than in the previous visit, and this required a bump up in her medication. Dr. Quillin described Ms. Davis as a tough, sweet lady who usually tried to smile but was weeping at their visit, and he thought she had "passive death wishes . . . ." That is, she was not suicidal but did not care if she died. He stated that she did not have day-to-day garden variety depression, but suffered from neurovegetative changes affecting her sleep, appetite, sexual function and energy level. Dr. Quillin stated that diffuse pain is a cardinal symptom of fibromyalgia, which is a very painful condition. He stated that he had training in physiology, but would defer to Dr. Garcia on the diagnosis of fibromyalgia, as that is a rheumatological diagnosis. He was still treating Ms. Davis at the time of trial. Dr. Quillin referred Ms. Davis to Dr. Michael Dole for pain management.

Dr. Michael Dole is board certified in internal medicine and physical medicine and rehabilitation. His pain management records indicate that on her first visit with him in November 2005, Ms. Davis' chief complaint was diffuse pain, a symptom of fibromyalgia, and Dr. Dole listed his first impression as fibromyalgia with thirteen positive tender points out of eighteen. Over the next two years, Dr. Dole reported a diagnosis of fibromyalgia at least sixteen times. His records indicated eighteen out of eighteen tender points in November of 2006, sixteen out of eighteen in October 2006 and May of 2007. These fluctuations are consistent with Dr. Garcia's testimony that the symptoms wax and wane with the level of pain and with time. On July 13, 2006, Dr. Dole stated that Mrs. Davis' symptoms were consistent with fibromyalgia and were secondary to her work injury in September 2000. In July

12

of 2007, five months before trial, he reported her pain level at eight out of ten (8/10), with ten being the highest pain indicator. Dr. Dole's clinical impression at that time was fibromyalgia "with an acute flair," neck pain, and bilateral upper extremity pain. Dr. Dole was still treating Ms. Davis at the time of trial.

The above medical evidence overwhelmingly outweighs the report of Dr. Wilson, the rheumatologist who examined Ms. Davis once on behalf of the DOTD. In a recent case, we articulated as follows:

> As a general rule, the testimony of a treating physician should be given greater weight than that of a physician who examined a claimant for diagnostic purposes only. *Winch v. Double M, Inc.*, 99-1793 (La.App. 3 Cir. 4/5/00), 764 So.2d 1055, *writ denied*, 00-1271 (La. 6/16/00), 765 So.2d 339. This is because the treating physician has the advantage of familiarity, since he or she is more likely to know the claimant's symptoms and complaints due to repeated examinations and sustained observations. *Alexander v. Autozone, Inc.*, 04-871 (La.App. 3 Cir. 12/8/04), 889 So.2d 366. Additionally, positive findings of medical experts are to be afforded greater weight than the negative findings as to the existence of a particular condition. *Campbell v. Luke Const. Co.*, 465 So.2d 688 (La.1985).

*Fontenot v. Wal-Mart,* 08-158, p. 14 (La.App. 3 Cir. 3/4/09), 5 So.3d 298, 307, *writ denied,* 09-0770 (La. 5/29/09), 9 So.3d 165. The majority refuses to recognize this well-settled rule in its analysis.

While the WCJ intimated, by her reference to an "unknown etiology," that fibromyalgia is not a compensable illness, Louisiana jurisprudence has held otherwise. Our courts have consistently held that fibromyalgia is compensable under a rebuttable presumption theory "if there is evidence of the injured person's good health before the accident and medical testimony showing a reasonable possibility that the accident caused the disability." *Maddox v. City of Oakdale,* 99-726, pp. 6-7 (La.App. 3 Cir. 11/3/99), 746 So.2d 764, 769, *writ denied,* 99-3388 (La. 2/11/00), 754

So.2d 936. Fibromyalgia has also been found compensable under the rebuttable presumption theory in: *Herren v. State,* 25,564 (La.App. 2 Cir. 2/23/94), 632 So.2d 880; *Theus v. Schumpert Med. Ctr.,* 25,750 (La.App. 2 Cir. 4/5/95), 653 So.2d 178, *writ denied,* 95-1442 (La. 9/22/95), 660 So.2d 475; and *Woodrum v. Olive Garden Restaurant,* 99-130 (La.App. 5 Cir. 5/19/99), 735 So.2d 911.[2] Fibromyalgia was also compensable in *Malbrue v. St. Landry Parish School Bd.,* 95-1426 (La.App. 3 Cir. 1996), 673 So.2d 1157 (compensability not challenged); *Lizana v. Gulf Coast Pain Institute,* 03-1672 (La.App. 1 Cir. 5/14/04), 879 So.2d 763; and *Frith v. Riverwood, Inc.,* 03-1340 (La.App. 1 Cir. 4/2/04), 878 So.2d 595, *writ granted,* 04-1086 (La. 1/19/05), 892 So.2d 7 (reinstated and increased attorney fees; addressed applicability of 1990 Amendments; reversed award of permanent total disability).

In addition to the above medical reports, Ms. Davis' husband of twenty-eight years testified that prior to the DOTD accidents Ms. Davis was extremely hearty and active, bailing hay and mowing the yard. Before the accidents, she did not have pain all over her body, weakness, fatigue, depression, crying spells, and was not up and down all night, as she was after the accidents. The symptoms of fibromyalgia began very shortly after Ms. Davis' work injuries in 2000. The DOTD attempted to rebut the presumption by arguing that the symptoms of fibromyalgia could be caused

---

[2]The DOTD cites the clearly distinguishable case of *Floyd v. Louisiana Dept. of Public Safety*, 08-899 (La.App. 3 Cir. 2/4/09), 3 So.3d 657, *writ denied*, 09-519 (La. 4/17/09), 6 So.3d 798. There, the claimant alleged an occupational disease due to chemical exposures at work and failed to prove that her fibromyalgia diagnosis was related to her work injuries. Mrs. Floyd struggled with two negatives that do not exist herein: the lack of immediacy inherent in occupational diseases, as opposed to identifiable accidents, as in Ms. Davis' case; and the timing of the diagnoses. In *Floyd*, the first mention of fibromyalgia was more than two years after the claimant's leave from work; the claims of MCE, mutiple chemical exposures, did not appear until six years after the alleged exposure, and there were no visits to doctors for acute exposure to chemicals in the workplace. Moreover, two physicians testified that the fibromyalgia derived from the chemical exposures and not from claimant's epicondylitis, as the claimant asserted. In the present case, Ms. Davis had symptoms of fibromyalgia shortly after her five foot drop from the asphalt dump truck onto her side in September 2000. Dr. Levinsohn suspected fibromyalgia in December 2000 and confirmed his impressions of fibromyalgia in January 2001, just four months after the fall. Additionally, Drs. Quilllen, Rambach, Dole, and Garcia related Ms. Davis' symptoms to her work accidents.

by hormonal imbalances or weight gain, but those arguments fail, as explained by Dr. Garcia's testimony discussed above. Accordingly, based upon the jurisprudence above, and the overwhelming record evidence, Ms. Davis has established the existence and the relatedness of fibromyalgia to her DOTD work injuries in 2000.

**The WCJ's Termination of All Benefits**

The record contains the medical reports and deposition testimony indicating that five of Ms. Davis' physicians related her symptoms to her DOTD accidents: Drs. Levinsohn, Rambach, Quillin, Garcia, and Dole. Dr. Michael Brunet of Tulane University Hospital treated Ms. Davis for rotator cuff injury and burning sensations in her right shoulder. In October 2001 he ordered a functional capacity evaluation (FCE) from a MISS-LOU Physical Therapy in Natchez, Mississippi. The results indicated that Ms. Davis put forth consistent maximum voluntary effort. She could lift up to ten pounds (considered light lifting), could sit or stand for approximately a half hour of each; could occasionally carry sixteen pounds, could push and pull twenty-two and twenty-four pounds respectively; and her dominant right hand was thirty-five to sixty percent (35% - 60%) weaker than her non-dominant left hand. In referring to the report, Dr. Brunet opined that Ms. Davis' condition was permanent and not likely to change with time. In February 2002, Dr. Rambach assessed Ms. Davis with a twenty-five percent (25%) permanent partial disability, and indicated that she would be relegated to sedentary work. A June 2006 FCE indicated that Ms. Davis could only lift up to ten pounds occasionally, and that her complaints of increased pain in her back, neck and right shoulder correlated with an increased heart rate during testing. On a continuum of job classifications, from Very Heavy, Heavy, Medium (her DOTD job), Light, and Sedentary, Ms. Davis was assessed with a functional capacity for Sedentary work only.

15

In July of 2006, Dr. Dole provided a disability evaluation indicating that Ms. Davis had a ten percent (10%) whole person impairment and was extremely limited in her functional abilities for lifting, reaching, and stooping, pursuant to the FCE performed two weeks prior. Dr. Dole reported that Ms. Davis' prognosis for returning to work was extremely guarded, that she would likely need vocational counseling and re-education. He further reported that, given her rural residential area and limited education (11th grade), it would be difficult to find employment that met her physical limitations.

During the December 2007 trial, Ms. Davis' attorney called as a witness the employer's adjuster, Kayla Crowe. Ms. Crowe reviewed Dr. Dole's medical records and effectively testified that she did not consider his impression of fibromyalgia one that rendered it a compensable condition, but she agreed that Dr. Dole's other two impressions, of neck pain and upper extremity pain, were matters "that without controversy" were "part of Mrs. Davis' injuries." At the time of trial, adjuster Kayla Crowe was still paying wage benefits to Ms. Davis based upon DOTD's own calculations, and was approving and paying for Dr. Michael Dole's services for pain management and Dr. Quillin's treatment of Ms. Davis for depression.[3] She was also paying the medical bills of Dr. Clark Gunderson, the orthopaedic surgeon who had performed a cervical fusion on Ms. Davis prior to trial.

Dr. Gunderson first saw Ms. Davis in May 2007 and reported possible cervical radiculopathy, pain with axial compression of head and neck, diminished grip strength on the right and diminished sensation in both thumbs. A June 2007 cervical MRI was abnormal, and Dr. Gunderson reported disc bulging at C5-6. A

---

[3]In fact, Ms. Davis' attorney subsequently argued that most of the benefits being paid were not even being disputed by the DOTD. At one point during the proceedings, the WCJ herself stated that "entitlement to benefits is not an issue because she's receiving them."

discogram reproduced Mrs. Davis' pain at C4-5. Our review indicates that this result is consistent with "tiny bulges" seen at C4-5 on Ms. Davis' November 2000 MRI. In 2007, Ms. Davis had tenderness from C5 - C7, and her range of motion was two thirds (2/3) of normal. Dr. Gunderson recommended surgery, which was approved by adjuster Kayla Crowe on October 29, 2007. Dr. Gunderson explained to Ms. Davis that she would not be pain free after the surgery but could have significant improvement. On November 15, 2007, Dr. Gunderson performed an anterior cervical fusion at C4-5 with anterior plate. Ms. Davis was also put on a bone stimulator. She appeared at trial three weeks later, on December 7, 2007, still wearing a neck brace.

Given the above evidence in the record, the WCJ manifestly erred in terminating Ms. Davis' wage benefits and in terminating all of her medical payments. The majority errs in deciding otherwise. Even the defendant's medical expert, Dr. Wilson, opined that Ms. Davis could not return to her former job and would likely be able to do only clerical-type work.

For the foregoing reasons, I dissent.